1
2
3
4
5
6
7

8                        UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   VICTOR ALFONSO HERNANDEZ,              No.  1:24-cv-00736-KES-SKO (HC)

12                  Petitioner,             **FINDINGS AND RECOMMENDATION
                                            TO DENY PETITION FOR WRIT OF
13         v.                               HABEAS CORPUS**

14   JASON SCHULTZ, Warden,                 **[THIRTY-DAY OBJECTION DEADLINE]**

15                  Respondent.

16

17          Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant

18   to 28 U.S.C. § 2254.  Petitioner is represented in this action by Robert J. Beles, Esq. This matter

19   was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302.  As

20   discussed below, the Court finds the petition to be without merit and recommends it be **DENIED.**

21   **I.       PROCEDURAL HISTORY**

22          On August 8, 2017, a Merced County jury found Petitioner guilty of first-degree murder

23   in violation of Cal. Penal Code § 187, enhanced for personal use of a firearm, and two counts of

24   home invasion robbery in violation of Cal. Penal Code § 211/213, also enhanced for personal use

25   of a firearm. (Doc. 8-2 at 195.[1]) Petitioner was sentenced a determinate term of 35 years and four

26   months plus an indeterminate term of 60 years to life. (Doc. 8-4 at 172-75.)

27   _____

28   [1] Citations are to ECF pagination unless otherwise noted.

                                            1

Petitioner appealed to the California Court of Appeal, Fifth Appellate District. On November 17, 2020, the appellate court remanded the case to the trial court for reconsideration of whether to impose the gun enhancements in light of recent legislation. (Doc. 8-17.) The judgment was affirmed in all other respects. (Doc. 8-17.)

Petitioner then petitioned for review in the California Supreme Court. (Doc. 8-20.)  On February 10, 2021, the California Supreme Court summarily denied review. (Doc. 8-21.)

Petitioner filed a petition for resentencing under Cal. Penal Code § 1170.95. (Doc. 8-22 at 120.) The petition was denied on March 3, 2022. (Doc. 8-24 at 25-26.)  Petitioner appealed, and on April 17, 2023, the appeal was denied. (Doc. 8-28.) Petitioner then petitioned for review in the California Supreme Court. (Doc. 8-29.) The petition was denied on June 21, 2023. (Doc. 8-30.)

On June 21, 2024, Petitioner filed a petition for writ of habeas corpus in this Court. (Doc. 1.)  Respondent filed an answer on August 23, 2024. (Doc. 10.)  Petitioner filed a traverse on September 20, 2024. (Doc. 11.)

## II.    FACTUAL BACKGROUND[2]

Petitioner and Juan Alvarez had been friends for years before the night of July 31, 2014. Juan[3] trusted Petitioner like a brother. Juan had also known Petitioner's friend, Orlando Yepez, "[o]n and off" for a year. Orlando also went by the name "Fat Joe."

Juan testified he had a lengthy criminal history and had been involved in cases involving drugs and guns. Juan had been convicted of misdemeanor domestic violence, money laundering, felony possession of drugs, conspiracy to distribute, and assault with a deadly weapon.

Juan and Orlando would rob other drug dealers. They would buy smaller quantities of drugs, obtain the drug dealer's trust, and then request a larger amount of drugs and rob the dealer. Juan would provide the money for the initial drug purchases. The last time Juan and Orlando robbed a drug dealer in this manner was on July 30, 2014. The robbery was successful, and Juan

---

[2] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1).  Therefore, the Court will rely on the Fifth DCA's summary of the facts in People v. Hernandez, No. F076542, 2020 WL 6741665, at *1-7 (Cal. Ct. App. Nov. 17, 2020).  See Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

[3] Several parties to the events at issue share last names. For clarity and consistency, individuals will be referred to by their first names.

got his money back from the scheme. As a result, Orlando knew Juan had $50,000 or more in his possession.

The next night, Juan was at a home in Hilmar with his girlfriend, Gloria Chavez. Juan was making a sandwich while Gloria watched television. At one point, Juan's brother arrived at the home to pick up a check. After Juan's brother left, there was another knock. Gloria assumed it was Juan's brother returning, but it was Petitioner and Orlando. Juan was surprised to see the two men. Petitioner and Orlando were wearing black clothing and hoodies. Petitioner was wearing gloves.

Orlando told Juan he had been robbed. Orlando told Juan he wanted help recovering what had been taken from him. Juan told Orlando he did not want to go and that he might help tomorrow. Juan told Orlando, "No," several times. Orlando asked Juan if he had a gun and Juan said, "No." Juan asked, "Why are you guys wearing all black?" Orlando then punched Juan in the face. Juan fell back and starting swinging at Orlando.

As Juan and Orlando were fighting, two other men entered the home, running in through the front door. The two men were William White and Petitioner's brother, Jose Hernandez. Jose began stabbing Juan with a screwdriver. Petitioner was saying, "Stab him." Juan tried to block the screwdriver and was stabbed in his left hand.

Petitioner "rush[ed]" at Juan with a black handgun and tried to hit him with it. Juan and Petitioner began fighting over the gun. Juan testified as to what happened next:

> We were fighting for the gun. I twisted it from him, and then I started putting my finger inside the trigger so I can let the shots go off. And that's when [Petitioner] shot himself in the leg.

Juan then "kept pushing" the trigger so that "there would be no more bullets" in the gun. The shots were going towards the kitchen, and Juan "guess[es] that's how Orlando must have got hit." Juan did not see Orlando get shot but knew Orlando had been shot because he was on the floor. Juan finally obtained control of the gun, but it had no more bullets. Juan saw that William was on top of Gloria, holding her down on the living room floor. He was holding a firearm.[4]

---

[4] Gloria said the gun was a "black rifle"; Juan said the gun was a handgun.

3

1    Jose ran out of the front door. William began firing a gun at Juan.[5] Juan knelt down until

2    William stopped firing and then ran into the garage. Juan opened the garage door and ran to a

3    neighbor's house. The assailants took between $8,000 and $10,000.

4    After no one answered at the first few houses he tried, Juan called 911.[6] Juan was bleeding

5    from his back and hand. Juan heard Gloria calling for him down the street.

6    Petitioner and William were in a car, screaming and looking for Jose. Petitioner got into

7    the driver's side door of his car and pointed his gun at Gloria. Once they drove away, Juan went

8    back into the house. Juan saw Orlando lying on the floor with "the big gun" on his lap. The police

9    arrived, and Juan told them that "they" had tried to rob and murder him. Juan also told officers he

10   had shot one of them. Juan had blood coming down his left arm "towards his hand."

11   Law enforcement officers found blood in the kitchen/living room area, the hallways, and

12   outside. Some of the blood found on the ground belonged to Juan. Law enforcement located a

13   rifle under Orlando, a .45-caliber Colt pistol on the couch, and a shotgun in a bedroom closet.

14   Juan's blood was found on the Colt pistol's grip, trigger and magazine. A print on the magazine

15   matched six points of Petitioner's left palm print, but to establish an identification, the California

16   Department of Justice requires eight clear matching points. Juan testified the .45-caliber pistol

17   found on the couch belonged to Petitioner.[7]

18   At the preliminary hearing, Juan testified the rifle – identified as an AR-15 – had been in

19   the home before Orlando arrived. Juan said Orlando grabbed the rifle when he came in the house.

20   At trial, Juan denied that he had a rifle in his house. Two screwdrivers were also located in the

21   residence. A forensic DNA analyst with the California Department of Justice was unable to locate

22   blood on the screwdrivers. If the screwdrivers had been used to stab someone, the analyst would

23   have expected to find blood on them. The analyst did find DNA on the screwdrivers, but not

24

25   [5] In an interview with detectives, Juan said he did not see the face of the person shooting at him. Shortly
     thereafter, he said the person who was shooting at him over the kitchen counter was the same person who
26   had been stabbing him: Jose. At trial, Juan testified that William was the person who shot at him.
     [6] During the call, Juan said, "They came in with guns, I took their guns away and I shot one of them."
27   [7] At the preliminary hearing Juan had indicated that the gun found on the couch was one he and others had
     taken "away from the people at the – of the drugs." At trial, Juan denied that the gun had been taken from
28   a prior robbery.

enough to "interpret the information." Law enforcement located six .45-caliber casings (five on the living room floor and one on the kitchen floor) and eight 9-millimeter casings (all on the kitchen floor). No nine-millimeter firearms were found at the scene.[8]

Several bullet holes were found in the residence. Based on trajectory angles, law enforcement concluded that shots had been fired from the kitchen towards the living room. Law enforcement also found a phone registered to William's girlfriend between some bushes across the street from the residence.

A.  Police Interviews

The next day, Juan told detectives: "We were 'fighting with the f[**]king gun right and that's when I f[**]king grabbed it and I shot and it just kept letting loose [ ] the whole f[**]king clip with his own gun ....'" Juan also told detectives he had "problems with the cartels." The cartels had given Juan "some shit" and he "got busted with it." Later, Juan said it was his friend who was "busted" with $200,000 worth of "weed." The cartel looked to Juan to pay them for the incident. Juan speculated that the cartels paid Orlando to "grab" him and take him to "TJ" where he would be killed.

Juan initially told law enforcement that the money belonged to either his sister or to Gloria. Juan later said the money belonged to his sister. When asked if Orlando came to the house to take the money, Juan said, "No, hell no." At trial, however, Juan testified that the assailants took $8,000 to $10,000 of his money. Juan also testified Orlando knew Juan had at least $40,000.

B.  Orlando's Girlfriend's Testimony

Orlando's girlfriend told police Orlando had gotten into an argument with Juan a couple days before the incident and was "really mad."

On the day of the incident, Orlando had begun crying and told his girlfriend and her daughter that he loved them. Orlando told her that she would be safer if she went to her mother's house, and that he was "gonna go do somethin[g]." Orlando also seemed, "very nervous." Around 10:00 or 11:00 p.m., Petitioner and Hugo arrived in a gray or white BMW and Orlando left.

---

[8] On August 15, 2014, law enforcement searched a residence in Chowchilla. Items at the residence led officers to conclude Juan lived there. A stolen nine-millimeter pistol was found in the home.

1

C.  <u>William's Girlfriend's Testimony</u>

2

William's girlfriend testified under a grant of immunity.[9] She testified that William often

3

went to a Walmart in Tracy to buy or sell drugs. On the night of the incident, William and his

4

girlfriend drove towards the Walmart and met Jose. Before arriving, William received a phone

5

call. During the phone call, William said, "Put me on. Put me on." "Put me on" means to "hook

6

me up" with "drugs or some activity." After the phone call concluded, William told his girlfriend

7

they were going to drive farther to meet with Jose. They drove to Jose's house and stopped there

8

for about an hour. They subsequently drove to a liquor store where they picked up an individual.

9

Though there was conflicting evidence on the point, it seems apparent this individual was Jose's

10

brother, Hugo Hernandez.[10]

11

William drove the four of them – William, his girlfriend, Jose, and Hugo – for a long time

12

down a "desolate road." Along the way, the men had "a lot" of phone calls during which they

13

spoke Spanish.  At some point, a black BMW pulled up alongside them. Jose went into the

14

BMW, and returned with a backpack. They resumed driving, following the black BMW. They

15

eventually arrived in a residential area and parked. William told his girlfriend, "I'll be right back.

16

I promise. I love you." William and Jose then left the car. Hugo got into the driver's seat.

17

About two to four minutes after William and Jose left, William's girlfriend heard what sounded

18

like gunshots. The shots were not all consecutive – she heard "[m]aybe four and then maybe four

19

more, three more. Something to that effect." Not more than three minutes after the last series of

20

gunshots, she saw William running back to the car. William had been gone for "seven minutes at

21

the most." William screamed, "Move, move, move." He had cash in his hands.

22

Jose never returned to the car. William said Jose had left with his other brothers in the

23

black BMW. Hugo got into the back seat and kept asking, "Where's my brothers?" William said,

24

"They're fine. They're with your older brother. They're all together."

25

_____

26

[9] Before immunity was granted, she lied to police, saying that she "didn't know anything."

27

[10] When William's girlfriend was shown a photograph of Hugo, she said he was not the person they picked up. However, William's girlfriend acknowledged that it was "dark" and "a long time ago," so she was uncertain of the identity of the individual. William testified that Hugo was the other person in the car.

28

Hugo.

William said "they" had brought a gun with them into the house but the "gun got taken" and used on "Fats." William said Jose had been shot in the leg, but he was okay. William said that their friend was not "going to make it," and William's girlfriend could not recall whether William referred to his friend as "Fats" or "Gordo."

The group also discussed the fact that the "house lick went bad." According to William's girlfriend, "house lick" was a "[s]treet term" that referred to a robbery. William said, "One of the people got a gun and shot the guy Fats."

They drove to a gas station where William asked his girlfriend to pump because he did not want to get out of the car. William asked his girlfriend to remove the piece of paper covering the license plate. She complied. The next day, William gave her $400 or $500.  William's girlfriend told him he was "stupid" for wearing short sleeves, because he could be identified by his tattoos. The day after the incident, William was worried about getting caught and was "looking on the computer for what happened."  William told her he owed Jose money for drugs.

D.  Police Interview of Petitioner

Police interviewed Petitioner on January 21, 2015. Petitioner admitted being at the scene of the murder and being shot in the leg. He said Orlando called him earlier on the day of the incident to say that "they" did not pay him money he was owed. Petitioner explained, "I guess [Orlando] introduced [ ] one of his friends to some other guy and . . . they robbed him." Petitioner then indicated Juan was the "friend" who committed this robbery. The unnamed victim of Juan's robbery told Orlando that since he had "introduced" them, it was Orlando's responsibility to get the victim's "shit back." Petitioner drove his father's BMW to Orlando's house around 10:00 p.m.

E.  Police Interview of Salvador Jimenez

Detective Jose Sanchez interviewed Salvador Jimenez at the Contra Costa County Jail. Jimenez told Detective Sanchez he was an inmate with William at the jail. Jimenez claimed William told him "he and four to five other individuals had traveled to the residence of the crime scene and had taken money, guns, and drugs." Jimenez said William was worried because detectives found his cell phone near the crime scene. William identified himself as one of the shooters, calling himself a "gunman." William told Jimenez he had been carrying a rifle or a

7

shotgun. William claimed he was going to receive cash for being the gunman for the job. William took $10,000 from the house and dropped $4,000 of it as he ran away from the scene.

Detective Sanchez said the story Jimenez relayed was corroborated by other statements and crime scene evidence. Specifically, Jimenez saying William told him he had dropped cash on the way out of the residence was consistent with the fact that cash was located on a nearby lawn.

At trial, Jimenez acknowledged he was incarcerated at the Contra Costa County jail in the fall of 2014. However, Jimenez said he did not remember William talking to him about a robbery/murder in which William was involved. Jimenez also said he did not recall giving a statement to Detective Sanchez. After Jimenez finished giving his trial testimony, he looked at William and whispered, "[G]ood." William nodded his head in acknowledgment.

F.  Autopsy

The doctor performing the autopsy removed Orlando's clothing, which included a black jersey and dark blue jeans. Orlando suffered two gunshot wounds. One gunshot entered around his left collar bone and exited his right flank. This gunshot was the cause of death, striking Orlando's lung, heart and liver. The other gunshot grazed his right shoulder.

G.  Cell Phone Evidence

Petitioner's cell phone "pinged in the Hilmar area" at 12:42 a.m. on the night of the murder, the same time the 911 call was made. At 12:52 a.m., Petitioner's cell pinged a tower in Turlock, California, north of the murder scene. At 12:55 a.m., Petitioner's cell pinged another tower in Turlock, "slightly north" of the tower pinged by the prior call.

A cell phone number attributable to Jose's wife was involved in nine outgoing or incoming calls between 11:34 p.m. and 11:45 p.m. on the night of the murder. They all pinged a tower in Hilmar approximately 2.3 miles from the murder scene. The majority of the calls were from or to Hugo.

Hugo's cell phone made 13 outgoing calls to Jose's wife's phone between 12:39 a.m. and 12:45 a.m. on the night of the murder. All the calls pinged off the same tower in Hilmar, a short drive away from the murder scene. William's girlfriend's phone traveled from the Bay Area to the Central Valley on the day of the murder and several calls were made to Jose on the night of

1    the murder.

2         H. <u>William's Testimony</u>

3         William admitted to having been convicted of second-degree robbery, assault by means of

4    force likely to produce great bodily injury, auto theft, and evading a peace officer in a vehicle in

5    2003. He also admitted he was convicted of attempted first degree burglary on November 7,

6    2011.

7         At the time of the incident, William was living with his parents in Antioch and dating his

8    girlfriend. William would get high on methamphetamine on weekends and would also sell

9    methamphetamine. William's source for purchasing methamphetamine was Jose Hernandez, who

10   he initially met in Avenal State Prison. William would purchase the drugs in the Central Valley.

11        Jose had sold William some poor quality methamphetamine. Jose said he would reimburse

12   Petitioner for the purchase. On July 31, 2014, William and his girlfriend drove to the Central

13   Valley to get the reimbursement money from Jose. They arrived in Modesto after 10:00 p.m. and

14   went to Jose's house. After about 30 to 45 minutes, Jose, William and William's girlfriend left in

15   Petitioner's car. They went to a liquor store to purchase wraps to use in rolling marijuana. They

16   then went to a location off a nearby freeway and picked up Jose's brother Hugo. Jose directed

17   William to get on a freeway and head toward Turlock and told him to get off on a particular exit.

18   William testified he believed they were traveling to a place where William could "get hooked up

19   with" a guy that was growing weed.  Eventually, Jose pointed out a vehicle and said, "Oh, there's

20   my brother's car." William pulled up next to the vehicle. William, Jose and Hugo exited the

21   vehicle. William told Jose to tell Hugo to stay in the car with his "girl," and Hugo returned to the

22   vehicle.

23         William and Jose approached a house and heard commotion inside. Orlando and

24   Petitioner were already inside. Juan's girlfriend answered the door and she looked like she had

25   been drinking. She looked at Jose and smiled and said, "They're in the kitchen." She then went to

26   a nearby couch.

27        Juan and Orlando were arguing. William tapped Jose and asked, "[W]hat the f[**]k is

28   going on, fool?" Jose said, "Hold on, fool." Juan pushed Orlando. Orlando punched Juan.

9

1   William was "pretty sure" it was Juan who then pulled out a gun (though he was "not 100

2   percent" sure). William did not know what was going on and ran out the door. William may have

3   pushed Juan's girlfriend onto the couch on his way out. William heard gunshots but did not see

4   who fired them.

5          As he was running away, William fell in the front yard or the street. He dropped $1,800 he

6   had been carrying in his pockets,[11] his cell phone and his keys. While outside, William heard

7   more gunshots. William eventually found his keys and some of the money he had dropped.

8   William jumped in the car and said he did not know "what the hell is going on." William told

9   Hugo his brother was fine. Someone told William that "Fat Joe or Gordo, or something, got shot."

10  This "meant absolutely nothing" to William because he did not know who Gordo was. William

11  drove away, stopped across from a 7-Eleven and told Hugo to get out. Hugo got out and William

12  drove back to the Bay Area.

13         William said he had not met Orlando before the night of the robbery. William testified he

14  did not know anything about a prior robbery involving Juan, Orlando and the Hernandezes.

15  William claimed he had no firearms with him that night and did not shoot anyone. He also

16  testified that he did not know there was going to be any firearm activity that night. William also

17  denied taking any money, drugs or firearms from the house, and being in debt to Jose.

18  **III.    DISCUSSION**

19         A.    Jurisdiction

20         Relief by way of a petition for writ of habeas corpus extends to a person in custody

21  pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or

22  treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

23  529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as

24  guaranteed by the United States Constitution.  The challenged conviction arises out of the Merced

25  County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. §

26  2254(a); 28 U.S.C.§ 2241(d).

27

28  _____
    [11] William claimed this was money he received from working, from his mother, and from a drug sale.

10

1    On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

2    1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

3    enactment.  Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases

4    filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA

5    and is therefore governed by its provisions.

6        B.    Legal Standard of Review

7    A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless

8    the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision

9    that was contrary to, or involved an unreasonable application of, clearly established Federal law,

10   as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was

11   based on an unreasonable determination of the facts in light of the evidence presented in the State

12   court proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003);

13   Williams, 529 U.S. at 412-413.

14   Under Section 2254(d)(1), a state court decision is "contrary to" clearly established

15   federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme

16   Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a

17   [Supreme Court] decision but reaches a different result."  Brown v. Payton, 544 U.S. 133, 141

18   (2005) (citing Williams, 529 U.S. at 405-406).  This court looks to "Supreme Court holdings at

19   the time of the state court's last reasoned decision" as "the source of clearly established Federal

20   law for the purposes of AEDPA."  Barker v. Fleming, 423 F.3d 1085, 1093 (9th Cir. 2005). A

21   Supreme Court precedent is not clearly established law under section 2254(d)(1) unless the Court

22   "squarely addresses the issue" in the case before the state court. Wright v. Van Patten, 552 U.S.

23   120, 125–26 (2008) (per curiam) (concluding that a state court had not unreasonably applied

24   federal law to a claim of prejudice under Strickland where the logic of petitioner's argument

25   would have required the extension of the Supreme Court's inherent prejudice doctrine to a new

26   context); Carey v. Musladin, 549 U.S. 70, 76–77 (2006) (same). While "[c]ertain principles are

27   fundamental enough that when new factual permutations arise, the necessity to apply the earlier

28   rule will be beyond doubt," Yarborough v. Alvarado, 541 U.S. 652, 666 (2004), "when a state

court may draw a principled distinction between the case before it and Supreme Court caselaw, the law is not clearly established for the state-court case." Murdoch v. Castro, 609 F.3d 983, 991 (9th Cir. 2010). "'[I]f a habeas court must extend a rationale before it can apply to the facts at hand,' then by definition the rationale was not 'clearly established at the time of the state court decision.'" White v. Woodall, 572 U.S. 415, 426 (2014) (quoting Yarborough, 541 U.S. at 666).

In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Cullen v. Pinholster, 563 U.S. 170, 203 (2011). The petitioner "must show far more than that the state court's decision was 'merely wrong' or 'even clear error.'" Shinn v. Kayer, 592 U.S. 111, 118 (2020) (quoting Virginia v. LeBlanc, 582 U. S. 91, 93 (2017) (*per curiam*)). Rather, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law *beyond any possibility of fairminded disagreement*." Richter, 562 U.S. at 103 (emphasis added); see also Kayer, 592 U.S. at 118. In other words, so long as fairminded jurists could disagree with each other as to whether the state court was correct, the state court decision is not unreasonable under AEDPA. Congress "meant" this standard to be "difficult to meet." Richter, 562 U.S. at 102.

Section 2254(d)(2) pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997). The federal habeas court must give "substantial deference" to the state court. Brumfield v. Cain, 576 U.S. 305, 314 (2015). "Factual determinations by state courts are presumed correct" and the petitioner bears the

12

1   burden of overcoming the presumption with "clear and convincing evidence to the contrary."

2   Miller-El, 537 U.S. at 340; 28 U.S.C. § 2254(e)(1). A state court's factual finding is unreasonable

3   when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Jeffries,

4   114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied,

5   Maddox v. Taylor, 543 U.S. 1038 (2004).  If "'[r]easonable minds reviewing the record might

6   disagree' about the finding in question, '. . . that does not suffice'" to prove the lower court's

7   factual determination was unreasonable. Wood v. Allen, 558 U.S. 290, 301 (2010) (alteration in

8   original) (quoting Williams v. Taylor, 529 U.S. 362, 410 (2000)).

9        To determine whether habeas relief is available under § 2254(d), the federal court looks to

10   the last reasoned state court decision as the basis of the state court's decision.  See Ylst v.

11   Nunnemaker, 501 U.S. 979, 803 (1991); Andrews v. Davis, 994 F.3d 1042, 1107 (9th Cir. 2019)

12   (en banc).  "[A]lthough we independently review the record, we still defer to the state court's

13   ultimate decisions."  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

14        The prejudicial impact of any constitutional error is assessed by asking whether the error

15   had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v.

16   Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)

17   (holding that the Brecht standard applies whether or not the state court recognized the error and

18   reviewed it for harmlessness).

19        C.    Review of Petition

20        Petitioner presents the following seven grounds for relief: 1) Trial counsel rendered

21   ineffective assistance by failing to offer prosecution witness Juan Alvarez's prior acts of violence

22   for propensity evidence and by failing to object to the court prohibiting the jury from using the

23   evidence for propensity purpose; 2) Petitioner was denied a fair trial because the jury instructions

24   allowed the jury to convict Petitioner of felony murder even if Juan Alvarez was the actual killer;

25   3) Trial counsel was ineffective in failing to object to the prosecutor's misstatements concerning

26   the law of felony murder; 4) Petitioner was denied his due process rights because the jury

27   instructions permitted the jury to find Petitioner liable for provocative act murder without finding

28   he personally harbored malice; 5) Petitioner was denied his due process rights because the trial

court found his juvenile adjudication was a strike despite there being no evidence Petitioner was at least 16 years old at the time of the offense; 6) Petitioner's juvenile adjudications as "strike" convictions violated his due process rights; and 7) the cumulative effect of the constitutional violations warrant habeas relief.

### 1. Claim One

Petitioner claims he was denied his Sixth Amendment right to counsel because trial counsel failed to offer prosecution witness Juan Alvarez's prior acts of violence for propensity evidence. He further argues trial counsel was ineffective by failing to object to the court prohibiting the jury from using the evidence for propensity purpose. Petitioner raised this claim on direct appeal. In the last reasoned decision, the appellate court denied the claim as follows:

**A. Background**

*1. First Incident*

Defendant called Bobby N. as a witness. In January of 2012, Bobby was at a restaurant. Bobby became aware of an argument outside the restaurant. He went outside and saw Juan with a nine-millimeter handgun. Juan pointed the gun at Bobby and others, but the clip fell out. Bobby ran to pick up the clip, but Juan attacked him. Juan hit Bobby in the face with the gun.

Immediately after Bobby offered this testimony on direct examination, the court stated:

> "Again, ladies and gentlemen, this evidence is received for the limited purpose to evaluate the believability of Juan Carlos Alvarez. You cannot consider it as evidence that the witness had a propensity – that the witness Juan Carlos Alvarez had a propensity to commit acts of violence or any other act in this case."

*2. Second Incident*

Defendant also called Officer Gregory Roton as a witness. Roton testified that in November of 2012, a detective told him a confidential informant had said Juan was in a restaurant with a handgun in a brown satchel. Law enforcement responded to the restaurant and found defendant in possession of a loaded nine-millimeter handgun.

Immediately after Roton offered this testimony, the court said:

> "Ladies and gentlemen, this evidence that a witness committed a crime or other misconduct is received for a limited purpose to evaluate the credibility of the witness. Not this witness, but Juan Carlos Alvarez in this particular circumstance. You cannot consider it as evidence that the witness Juan Carlos Alvarez had a propensity to commit a violent crime or any other crime. It's received for a limited purpose."

14

1

2

### 3. Search of Residence

On August 15, 2014, law enforcement searched a residence in Chowchilla. Items at the residence led officers to conclude Juan lived there. A stolen nine-millimeter pistol was found in the home.

The court did not admonish the jury about propensity inferences after this evidence was introduced. Earlier, outside the presence of the jury, the court concluded this evidence was "not just for impeachment purposes" and agreed with defense counsel that the evidence "goes to the defense of the case."

### 4. Jury Instructions

At the conclusion of trial, the court instructed the jury with CALCRIM No. 316 as follows:

> "If you find that a witness has committed a crime or other misconduct, you may consider that fact only in evaluating the credibility of the witness' testimony. The fact that a witness may have committed a crime or other misconduct does not necessarily destroy or impair the witness' credibility. It is up to you to decide the weight of that fact and whether that fact makes the witness less believable."

### 5. Analysis

Propensity evidence is generally inadmissible except where provided by statute. (Evid. Code, § 1101, subd. (a).) One exception is found in Evidence Code section 1103. Under that provision, the defendant may offer evidence of a victim's character to prove the victim acted in conformity with his/her character. (Evid. Code, § 1103, subd. (a)(1).) However, if the defendant avails himself of that option by offering evidence tending show the victim was violent, it opens the door for the prosecution to introduce "evidence of the defendant's character for violence or trait of character for violence." (*Id.*, subds. (a)(2) & (b).)

Defendant argues his trial counsel should have offered the evidence cited above not merely as impeachment evidence, but also as propensity evidence under Evidence Code section 1103, tending to show Juan was disposed to acts of violence. In the same vein, he contends counsel should have objected to the trial court's admonishments to the jury regarding propensity inferences, and the court's use of an unmodified version of CALCRIM No. 316. Counsel's failure to do so, he argues, hampered the defense's position that Juan was the aggressor during the incident in question.

"To establish ineffective assistance of counsel, a defendant must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and counsel's deficient performance was prejudicial, that is, there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. [Citations.]" (*People v. Sepulveda* (2020) 47 Cal.App.5th 291, 301.)

"'Unless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy."' [Citation.] When the record on direct appeal sheds no light on why counsel failed to act in the manner challenged, defendant must show that there was

15

1   ""no conceivable tactical purpose'" for counsel's act or omission. [Citations.]'
2   [Citation.]" (*People v. Centeno* (2014) 60 Cal.4th 659, 674–675.)

3   Here, defendant cites nothing in the record where counsel explained the challenged
    omission. Consequently, the defendant must show that there was no conceivable
4   tactical purpose for counsel's omission. Here, however, there is a conceivable
    explanation. Perhaps defense counsel knew of some incidents of violence in
5   defendant's past. And, perhaps defense counsel concluded the risk of opening the
    door to evidence of those incidents was not worth the incremental benefit of
6   having the jury consider Juan's past incidents as propensity evidence.

7   Defendant argues that certain past offenses and juvenile adjudications referenced
    in the probation report and cited by the Attorney General on appeal, were either
8   nonviolent or too remote to be probative. However, the prosecution's rebuttal
    propensity evidence would not have been limited to the specific incidents the
9   parties identify. Indeed, the prosecution would not have even been limited to
    incidents that resulted in convictions or juvenile adjudications. It remains
10  conceivable that defendant was involved in more recent incidents of violence that
    did not result in convictions but could have been detrimental to his case. Because
11  of this conceivable possibility, defendant's claim must be rejected on appeal.

12  Hernandez, 2020 WL 6741665, at *7-9 (footnote omitted).

13                          a.   Legal Standard

14          Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth

15  Amendment.  Evitts v. Lucey, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of

16  counsel are reviewed according to Strickland's two-pronged test.  Strickland v. Washington, 466

17  U.S. 668, 687-88 (1984); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989); United States v.

18  Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also Penson v. Ohio, 488 U.S. 75 (1988) (holding

19  that where a defendant has been actually or constructively denied the assistance of counsel

20  altogether, the Strickland standard does not apply and prejudice is presumed; the implication is

21  that Strickland does apply where counsel is present but ineffective).

22          To prevail, Petitioner must show two things.  First, he must establish that counsel's

23  deficient performance fell below an objective standard of reasonableness under prevailing

24  professional norms.  Strickland, 466 U.S. at 687-88.  Second, Petitioner must establish that he

25  suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional

26  errors, he would have prevailed at trial. Id. at 694. A "reasonable probability" is a probability

27  sufficient to undermine confidence in the outcome of the trial. Id. The relevant inquiry is not what

28  counsel could have done; rather, it is whether the choices made by counsel were reasonable.

                                    16

1   Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).

2         With the passage of the AEDPA, habeas relief may only be granted if the state-court

3   decision unreasonably applied this general Strickland standard for ineffective assistance.

4   Knowles v. Mirzayance, 556 U.S. 111, 122 (2009).  Accordingly, the question "is not whether a

5   federal court believes the state court's determination under the Strickland standard "was incorrect

6   but whether that determination was unreasonable–a substantially higher threshold."  Schriro v.

7   Landrigan, 550 U.S. 465, 473 (2007); Knowles, 556 U.S. at 123.  In effect, the AEDPA standard

8   is "doubly deferential" because it requires that it be shown not only that the state court

9   determination was erroneous, but also that it was objectively unreasonable.  Yarborough v.

10  Gentry, 540 U.S. 1, 5 (2003).  Moreover, because the Strickland standard is a general standard, a

11  state court has even more latitude to reasonably determine that a defendant has not satisfied that

12  standard.  See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule

13  application was unreasonable requires considering the rule's specificity.  The more general the

14  rule, the more leeway courts have in reaching outcomes in case-by-case determinations.")

15                              b.  Analysis

16        The state court reviewed Petitioner's claim under the Strickland standard and determined

17  that Petitioner failed to show counsel erred. Thus, the only question before this Court is whether

18  that determination was objectively unreasonable.  The Court finds that it was not.

19        First, the appellate court noted that it was unknown why defense counsel did not seek to

20  introduce Juan Alvarez's prior bad acts as evidence of propensity for violence, or why he did not

21  object to the trial court's limiting instructions. The appellate court was left to consider the

22  possible reasons for defense counsel's actions or inactions, but without evidence of an

23  unreasonable decision by counsel, the appellate court would not second guess defense counsel's

24  tactics.  Petitioner fails to show how the state court's determination was unreasonable.

25  Strickland, 466 U.S. at 689 ("Judicial scrutiny of counsel's performance must be highly

26  deferential").

27        The court also noted that there were several possible valid reasons why defense counsel

28  may have decided not to seek to introduce the evidence for propensity purposes. The court noted

17

1    that this would have opened the door for the prosecution to introduce evidence of Petitioner's

2    own prior bad acts. This would include prior convictions and juvenile adjudications but could also

3    include incidents of violence that did not result in conviction. The appellate court reasoned that

4    counsel may have determined it would damage Petitioner's defense more than assist it, because

5    Juan Alvarez's prior bad acts were already before the jury for purpose of impeachment, and the

6    incremental value that could have been obtained by using the evidence for propensity would have

7    been outweighed by the damage done by the introduction of Petitioner's own bad acts.

8         Petitioner decries the appellate court's investigation into whether there was a "conceivable

9    tactical explanation" as unreasonable "extrajudicial conjecture." (Doc. 1 at 21.)  In Strickland, the

10   Supreme Court directed courts of appeal to "properly apply the strong presumption of

11   competence." Strickland, 590 F.3d at 673. The Supreme Court stated that "Strickland specifically

12   commands that a court 'must indulge [the] strong presumption' that counsel 'made all significant

13   decisions in the exercise of reasonable professional judgment.'"  Pinholster, 563 U.S. at 196

14   (quoting Strickland, 466 U.S. at 689-690).  Appellate courts are "required not simply to 'give

15   [the] attorneys the benefit of the doubt,' but to affirmatively entertain the range of possible

16   'reasons [defendant's] counsel may have had for proceeding as they did.'" Pinholster, 563 U.S. at

17   692 (citing Strickland, 466 U.S. at 689-90); see also Washington v. Shinn, 46 F.4th 915, 927-28

18   (9th Cir. 2022).

19        Further, the appellate court's assertion of the existence of other bad acts was not

20   unfounded as Petitioner maintains. While it is true Petitioner was only convicted of one count of

21   vehicle theft, he had been previously charged with carjacking, robbery and fighting in public.

22   (Sealed Conf. CT 12-13). These incidents were readily available for impeachment purposes.

23        Petitioner also failed to show prejudice, that is, but for defense counsel's errors, the

24   outcome would have been different. Petitioner contends that his defense was that Juan Alvarez

25   killed Orlando and shot Petitioner, then invented the robbery story to exculpate himself. (Doc. 1

26   at 21.) He contends that the evidence supporting Juan Alvarez's story was weak since the other

27   witnesses all suffered credibility problems. (Doc. 11-1 at 2-3.) As previously noted, however, the

28   prior bad act evidence was in fact admitted to evaluate Juan Alvarez's credibility. In this way, the

18

1    jury considered whether Juan Alvarez's story was true considering his prior bad acts. A

2    fairminded jurist could agree with the state court's determination that allowing the jury to

3    consider the evidence for propensity purposes as well would not have altered the outcome.

4         Moreover, the evidence against Petitioner was not weak. The witnesses' testimonies and

5    statements to police, the jail informant's testimony, the crime scene evidence, and the actions of

6    the parties after the incident all served to corroborate the victim's version of events.  First,

7    statements made by witnesses provided substantial evidence that the event was a coordinated

8    robbery of Juan Alvarez by Petitioner, his two brothers, William, and Orlando. William's

9    girlfriend testified that William, along with Petitioner's brothers Jose and Hugo, drove together to

10   Juan Alvarez's house. At one point, a black BMW pulled up alongside them. Jose went into the

11   BMW and returned with a backpack. Eventually they arrived at a residential area and parked, and

12   William and Jose left the car. Hugo got into the driver's seat. William told his girlfriend, "I'll be

13   right back. I promise. I love you." A few minutes later she heard gunshots and saw William

14   running back to the car with cash in his hands. He said they had brought a gun into the house, but

15   the gun got taken and used on "Fats." William said the friend wasn't going to make it. The

16   girlfriend stated the group discussed how the robbery went bad. At a gas station, William asked

17   her to remove a piece of paper that had been covering the license plate. The next day, William

18   gave her $400 or $500. She stated William was worried he was going to get caught. Her

19   testimony refuted Petitioner's defense that he and his group were the victims of the robbery.

20        Orlando's girlfriend also testified that Orlando was very distraught on the day of the

21   incident. He began to cry and told his girlfriend and her daughter that he loved them and advised

22   them to go to her mother's house because he was "gonna go do somethin[g]."

23        A jail informant provided a statement to police that William told him he and four to five

24   other individuals had traveled to the residence of the crime scene and taken money, guns, and

25   drugs. The informant stated William was worried because detectives had discovered his cell

26   phone near the crime scene. William told him he was one of the shooters, and he had been

27   carrying a rifle or shotgun. William told him he was going to be paid $10,000 for the job and had

28   dropped $4,000 when he fled the scene. This was corroborated by the fact that cash was located

near the crime scene. Although Jimenez denied this statement at trial, when he finished his trial testimony, he looked at William and whispered, "[G]ood," to which William nodded in acknowledgment.

The physical evidence at the crime scene also corroborated Juan Alvarez's version of events. Juan Alvarez suffered defensive injuries to his hand and multiple puncture wounds to his back consistent with his testimony that he had been repeatedly stabbed with a screwdriver. Petitioner had no explanation for the injuries sustained by the victim. Casings were also found throughout the house consistent with Juan Alvarez's testimony of the manner in which the struggle unfolded. The trajectory of the bullet holes in the couch and floor were also consistent with his testimony that William had shot at him.

The actions of the parties corroborated Juan Alvarez's testimony that he was the victim of a robbery and contradicted Petitioner's defense that he was the actual victim. Juan Alvarez immediately ran to his neighbors for help, called 9-1-1 to report he had been robbed, sought medical attention for his injuries, and cooperated with police. On the other hand, Petitioner and his compatriots fled the scene and did not notify law enforcement. Petitioner also did not seek medical attention for the gunshot wound to his leg.  He also moved shortly after the incident to the Bay Area and obtained a new cellphone. Petitioner's actions represented the actions of a fugitive from a crime, as opposed to Juan Alvarez's actions which evinced the mentality of a victim. Considering the foregoing, Petitioner fails to show that but for counsel's alleged error, the result would have been different.

In sum, Petitioner fails to overcome _Strickland's_ high standard of demonstrating the state court rejection of his claim to be objectively unreasonable, and fails to show that the state court decision resulted from an unreasonable determination of the facts. The claim should be denied.

### 2.  Claim Two

Petitioner next alleges he was denied his Sixth Amendment right to a jury trial and his Fourteenth Amendment due process rights because the jury instructions allowed the jury to convict Petitioner of felony murder even though Juan Alvarez was the actual killer. Petitioner submits that under California law, for the felony murder doctrine to apply, the defendant or one of

his accomplices must be the actual killer. If the intended victim is the actual killer, he notes, the applicable doctrine is provocative act murder which required a finding of malice. He contends that Juan was the actual killer, and therefore, the instructions on felony murder were erroneous.

Petitioner raised this claim on direct appeal. The Fifth DCA rejected the claim as follows:

Defendant next argues the court gave erroneous instructions regarding felony murder.

"Under the felony murder-doctrine, when the defendant or an accomplice kills someone during the commission, or attempted commission, of an inherently dangerous felony, the defendant is liable for either first or second degree murder, depending on the felony committed." (*Gonzalez, supra*, 54 Cal.4th at p. 654, italics omitted.) "Felony-murder liability does not require an intent to kill, or even implied malice, but merely an intent to commit the underlying felony. [Citation.]" (*Ibid.*) Thus, felony murder can apply even when the killing is negligent or unintentional. (See *People v. Johnson* (1972) 28 Cal.App.3d 653, 658.)

"If the killing is not committed by the defendant or an accomplice, however, the felony-murder doctrine does not apply. [Citation.]" (*Gonzalez, supra*, 54 Cal.4th at p. 654.) This caveat is at the center of defendant's claim of instructional error.

"In reviewing any claim of instructional error, we must consider the jury instructions as a whole, and not judge a single jury instruction in artificial isolation out of the context of the charge and the entire trial record. [Citations.]" (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 276.)

### A. Court's Instructions

The court instructed the jury:

"The defendants are charged in Count One with murder under a theory of felony murder.

"To prove that a defendant is guilty of first-degree murder under this theory, the People must prove that: One, the defendant committed robbery or burglary; two, the defendant intended to commit robbery or burglary; and, three, when committing robbery or burglary, the defendant caused the death of another person."

"[A] person may be guilty of felony murder even if the killing was unintentional, accidental, or negligent.

Shortly thereafter, the court instructed:

"The defendants may also be guilty of murder under a theory of felony murder even if another person did the act that resulted in the death. I will call the other person "the perpetrator."

"To prove that a defendant is guilty of first-degree murder under this theory, the People must prove that: One, the defendant committed or aided and abetted or was a member of the conspiracy to commit robbery or burglary; two, the defendant intended to commit and intended to aid and

21

abet the perpetrator in committing or intended that one or more members of the conspiracy commit robbery or burglary; three, if the defendant did not personally commit robbery or burglary, then a perpetrator whom the defendant was aiding or abetting or with whom the defendant conspired, personally committed robbery or burglary; and, four, when committing robbery or burglary, the perpetrator caused [the] death of another person.

"A person may be guilty of felony murder even if the killing was unconditional, [Fn.14] accidental, or negligent.

> [Fn.14] This should have been "unintentional." (See CALCRIM No. 540B.)

[¶] ... [¶]

"The defendant must have intended to commit or aided and abetted or been a member of a conspiracy to commit the felonies of robbery or burglary before or at the time that it caused the death.

"It is not required that the person killed be the victim of the felonies.

"An act causes death if the death is the direct, natural and probable consequence of the act and the death would not have happened without the act. A natural and probable consequence is one that a reasonable person would know if likely to help if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence.

"There may be more than one cause of death. An act causes death only if it is a substantial factor in causing the death. A substantial factor is more than a trivial or remote factor. However, it does not have to be the only factor that causes the death."

### B. Analysis

As noted above, the felony-murder doctrine does not apply if the killing is not committed by the defendant or an accomplice. (*Gonzalez, supra*, 54 Cal.4th at p. 654.) Defendant contends that the felony-murder instructions were factually unsupported. Defendant argues that the evidence established that Juan killed Orlando "either by personally firing the gun or, at the very least, manipulating the bullet path." And since the felony-murder rule only applies when the defendant or an accomplice is the actual killer, the instructions were unsupported here.

It is true that an accomplice merely being a proximate cause of a death is not enough to trigger the felony-murder doctrine. (*People v. Washington* (1965) 62 Cal.2d 777, 781.) The accomplice (or the defendant) must have also been the actual killer. (*Ibid.*) However, the jury could have reasonably concluded defendant was more than just a proximate cause of Orlando's death. Based on the circumstances described below, the jury could have reasonably concluded defendant was an "actual killer" as much as Juan was.

Initially, defendant had control of the gun. Defendant rushed at Juan with the gun and the two men struggled over the gun. During the struggle, several rounds were

22

discharged. Juan testified that "we" (i.e., Juan and defendant) "were shooting towards ... the kitchen." Thus, there was evidence that neither Juan nor defendant had complete control of the gun when the rounds were discharged. [Fn.15] This is important, because at least two acts go into a killing-by-firearm: (1) causing the gun to be facing a particular direction and (2) pulling the trigger. Here, the jury could have quite reasonably concluded that, during their struggle, defendant and Juan concurrently caused the gun to be pointed whatever direction it was facing when it fired the fatal shot. [Fn.16] The jury could have reasonably concluded that defendant's shared control over the gun was such that he and Juan both "actually" killed Orlando. Defendant himself argues that Juan was an actual killer because he, at a minimum, was involved in "manipulating the bullet path." However, the evidence described above showed that defendant was also involved in "manipulating the bullet path." The court's instructions properly permitted the jury to find that defendant was an actual killer of Orlando, and that the felony-murder rule applied.

> [Fn.15] There was other evidence, such as Juan's 911 call or statements to police, arguably suggesting Juan had more control of the gun when the shots were fired. However, the issue is merely whether the jury should have been instructed on this particular theory, not whether the evidence conclusively established it. The jury could have chosen to reject the evidence suggesting Juan had more control of the gun and instead accepted Juan's trial testimony that the shots were discharged during the struggle and indicating he only gained control of the gun after the clip had been emptied.

> [Fn.16] This scenario assumes defendant's gun fired the fatal shot, rather than William's gun. No one disputes there was sufficient evidence on which a jury could have concluded defendant's gun fired the fatal shot. While acknowledging that Orlando was *likely* killed by the gun Juan and Victor were fighting over, the Attorney General notes there was evidence from which a jury could conclude that William shot Orlando. The evidence indicates that the gun Juan and Victor struggled over was the .45-caliber Colt pistol found on the couch after the incident. Given that nine-millimeter casings were also found at the scene, and the testimony that William fired several shots from a handgun towards the kitchen, a jury could reasonably conclude that William was wielding a nine-millimeter handgun. The Attorney General observes that no forensic evidence establishes that the bullet that killed Orlando was .45-caliber rather than nine-millimeter. This leaves open the theoretical possibility that Orlando was killed by a nine-millimeter bullet fired by William.

Defendant nonetheless insists that the instructions erroneously *permitted* the jury to convict him on a felony-murder theory even if it concluded Juan was the only actual killer. Defendant argues the instructions were improper for because they permitted the jury to apply the felony-murder doctrine so long as defendant was a "substantial" factor in the death. In other words, defendant contends, the instructions permitted the jury to convict on the mere findings that defendant committed a robbery, someone died, and defendant was a nontrivial cause of that death. We disagree. The court's instructions required more than "nontrivial" or "substantial" causation. They *also* required that defendant's act be a *direct* and "*but-for*" cause of the death. Specifically, the court instructed the jury:

> "An act causes death if the death is the *direct*, natural, and probable consequence of the act and the death *would not have happened without the*

1
2
3

*act*. A natural and probable consequence is one that a reasonable person would know is likely help [*sic*] if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence."

4
5
6

These instructions made clear that "causing" a death means committing an act that *directly* causes a death that would not otherwise have occurred. As a result, the instructions, when read as a whole, did not permit a felony murder conviction based solely on the defendant's participation in an underlying felony that unleashed a cascading chain of events culminating in a death.

7

Hernandez, 2020 WL 6741665, at *11-14 (footnote omitted).

8

a.   Legal Standard and Analysis

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Petitioner contends the trial court erroneously instructed the jury on felony murder because the evidence did not support the instructions. On federal habeas review of a claim of instructional error by a state court, federal courts are bound by a state court's interpretation of state law. Bradshaw, 546 U.S. at 76 ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); Estelle, 502 U.S. at 71-72 (the assertion that a jury instruction "was allegedly incorrect under state law is not a basis for habeas relief"). Federal habeas relief based on instructional error is warranted only if the petitioner shows "both that the instruction was ambiguous and that there was a reasonable likelihood that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt.'" Waddington v. Sarausad, 555 U.S. 179, 190-91 (2009) (quoting Estelle, 502 U.S. at 73 n.4).  In making this determination, "the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." Estelle, 502 U.S. at 72 (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)). The Supreme Court has explained that "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." Middleton v. McNeil, 541 U.S. 433, 437 (2004) (*per curiam*). "[I]t is not enough that there is some 'slight possibility' that the jury misapplied the instruction." Waddington, 555 U.S. at 191 (quoting Weeks v. Angelone, 528 U.S. 225, 236 (2000)). Rather, "the pertinent question 'is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" Id. (quoting Estelle,

1   502 U.S. at 72).

2       Viewing the jury instructions as a whole along with the trial record, and taking into

3   account that this Court is bound by the state court's interpretation of state law, Petitioner is not

4   entitled to relief. The instructions were not erroneous under California law as determined by the

5   state court. The state court also reasonably determined that the evidence supported the instruction.

6   Specifically, the state court determined that the jury could have reasonably concluded that

7   Petitioner was an "actual killer" such that the felony murder doctrine applied. As noted by the

8   state court, the evidence did not show which gun caused Orlando's death. It was possible that the

9   fatal shots were fired by Petitioner's accomplice William, which would support the felony murder

10  instructions. It was also possible that the shots came from the gun which Petitioner and Juan

11  Alvarez struggled over. As to that particular weapon, there was evidence that Petitioner and Juan

12  Alvarez both held the gun while they struggled to gain control of it. Juan Alvarez testified at trial

13  that they shot the weapon "together" toward the kitchen during the struggle. Thus, the jury could

14  have concluded that Petitioner and Juan Alvarez shared control of the gun and caused it to point

15  and fire in whatever direction it was facing. A fairminded jurist could conclude that the state court

16  reasonably found that evidence supported the giving of the instruction.

17      Petitioner also claims that the instruction permitted the jury to convict Petitioner of felony

18  murder while simultaneously concluding that neither Petitioner nor his accomplices fired the

19  weapon that killed Orlando. The state court reasonably determined that the instructions did not

20  support this theory. First, the instructions required more than "nontrivial" or "substantial"

21  causation. They required that Petitioner's act be a "direct" and "but-for" cause of the death. In his

22  traverse, Petitioner argues that the jury could have found Petitioner guilty of felony murder based

23  only on the death being a "natural and probable consequence" of the robbery. As stated by the

24  state court, however, the jury was instructed that the act causing death must be the "*direct,*

25  natural, and probable consequence of the act and the death *would not have happened without the*

26  *act*." Hernandez, 2020 WL 6741665, at *14. The instructions do not support Petitioner's

27  contention that the jury was permitted "to apply the felony-murder doctrine so long as petitioner

28  was a non-trivial cause of [Orlando's] death." (Doc. 11-1 at 5.)

In summary, the state court's conclusion that there was no instructional error is binding on this Court. See Gonzalez v. Gonzalez, 394 Fed.Appx. 415, 415-16 (9th Cir. 2010).  Further, the instruction did not deprive Petitioner of his right to jury instructions on every element of the offense, nor did the instruction "so infect[] the entire trial that the resulting conviction violate[d] due process." Henderson v. Kibbe, 431 U.S. 145, 154 (1977). The claim should be denied.

### 3.   Claim Three

Petitioner contends defense counsel was ineffective when counsel failed to object to the prosecutor's misstatements of law concerning felony murder. Petitioner raised this claim on direct review. The appellate court rejected the claim in the last reasoned state court decision, as follows:

Defendant contends counsel was ineffective for failing to object to certain statements by the prosecutor during closing.

#### A. Background

During closing, the prosecutor stated:

"So let me first begin with the discussion – you just heard the rules – the discussion of first-degree felony murder.

"If the defendant committed the enumerated felony, in this case a robbery, or aided – that is, encouraged, facilitated, et cetera – in the commission of a robbery, or conspired – that is, agreed to commit the robbery and then did some overt acts – that person is guilty of murder."

Shortly thereafter, the prosecutor said:

"If you do a first-degree burglary and somebody dies, you're guilty of felony murder. It's that simple."

Later still, the prosecutor stated:

"[I]f you find your review of the evidence that a robbery was committed by these individuals, Victor Hernandez and William White, they're guilty of felony murder."

#### B. Ineffective Assistance

"To establish ineffective assistance of counsel, a defendant must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and counsel's deficient performance was prejudicial, that is, there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. [Citations.]" (*People v. Sepulveda, supra*, 47 Cal.App.5th at p. 301.)

"[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged

26

1   deficiencies.... If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, ... that course should be followed." (*Strickland v.*

2   *Washington* (1984) 466 U.S. 668, 697.)

3   *C. Analysis*

4   As the Attorney General concedes, the prosecutor's comments were incomplete as to the requirements of felony murder. The court instructed the jury that a required

5   element of felony murder was a finding that "the defendant caused the death..." or another perpetrator of the robbery or burglary "caused [the] death." In other words,

6   the death needed to be caused by defendant or an accomplice. The prosecutor's comments suggest such a finding is unnecessary to a felony-murder conviction.

7

8   However, we conclude defendant has not shown "there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the

9   defendant. [Citations.]" (*People v. Sepulveda, supra,* 47 Cal.App.5th at p. 301.) The court instructed the jury with the following portion of CALCRIM No. 200:

10   "You must follow the law as I explain it to you even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you

11   must follow my instructions." And, as noted above, the court's instructions clearly required that, for a conviction under the felony-murder rule, the jury needed to find

12   that "the defendant caused the death..." or another perpetrator of the robbery or burglary "caused [the] death." If the jury understood the prosecutor's comments to

13   mean that such causation was not required, they were under express instructions from the court to disregard that suggestion and to instead follow the court's

14   instructions. Jurors are presumed to follow the court's instructions. (*People v. Holt* (1997) 15 Cal.4th 619, 662.)

15   Moreover, counsel for codefendant William White specifically directed the jurors' attention to the issue. He argued:

16

17       "You've got the instructions there, and one of the instructions is that if you find there's a conflict between what the attorneys say and what you've read

18       and heard in the instructions, you have to go based on the instructions. [¶] When [the prosecutor] was talking to you about felony murder, I think

19       what he said was that, 'Hey, it doesn't matter [i]f you have a robbery or a burglary and there's a conspiracy and someone dies, you have to find them guilty.' [¶] Well, that's not really true. That's not what the law says."

20

21   Shortly thereafter, he stated: "If there's a robbery or a burglary and someone dies, that's not felony murder. If *one of the defendants* shoots somebody in the course of

22   a robbery, then *that's* felony murder." (Italics added.)

23   The fact that codefendant's counsel expressly made the jury aware of a conflict on this point of law, strengthens the assumption that the jurors would know to apply

24   CALCRIM No. 200 and follow the court's substantive instructions rather than the prosecutor's comments.

25   Consequently, we conclude that defendant has not shown "a reasonable probability that, but for counsel's failings, the result would have been more favorable to the

26   defendant. [Citations.]" (*People v. Sepulveda, supra*, 47 Cal.App.5th at p. 301.)

27   Hernandez, 2020 WL 6741665, at *14-15.

28

a. <u>Analysis</u>

As set forth previously, claims of ineffective assistance of counsel are reviewed under <u>Strickland's</u> two-pronged test. <u>Strickland</u>, 466 U.S. at 687-88. The state court correctly applied the <u>Strickland</u> standard here; therefore, the question before this Court is whether that application was objectively unreasonable.

The state court found that the prosecutor's statements were incomplete statements of the law, but determined that Petitioner suffered no prejudice from counsel's failure to object because the trial court's instructions properly and completely stated the law. A jury is presumed to follow the trial court's instructions. <u>Weeks v. Angelone</u>, 528 U.S. 225, 234 (2000). As Respondent notes, codefendant's counsel argued that the prosecutor had given an incomplete statement of the law. (Doc. 8-11 at 111-13.) Counsel argued that if the jury found Juan Alvarez was the actual killer, the appropriate legal doctrine was provocative act murder. (Doc. 8-11 at 111-13.) Considering the actual instructions given, coupled with codefendant's counsel's argument, the state court reasonably found that Petitioner's counsel's failure to object or call attention to the prosecutor's misstatement could not have been prejudicial.

4.   <u>Ground Four</u>

In his next claim for relief, Petitioner contends he was denied his rights to fair trial and due process because the jury instructions permitted the jury to find Petitioner guilty of provocative act murder without finding he personally harbored malice. In the last reasoned decision, the Fifth DCA agreed the instruction was erroneous; nevertheless, the court determined the error was harmless, as follows:

> Defendant also argues the jury was misinstructed on the malice element of provocative act murder. We agree, but conclude the error was harmless.
>
> The court instructed the jury as follows:
>
> > "To prove that a defendant is guilty of murder under the provocative act doctrine, the People must prove that: One, the defendant was an accomplice of Orlando Yepez, Victor Hernandez, Jose Hernandez, or William White in committing robbery in concert or burglary; two, in committing robbery in concert or burglary, Orlando Yepez, Victor Hernandez, Jose Hernandez, or William White intentionally did a provocative act; three, *Victor Hernandez, William White, Jose Hernandez,* ___or___ *Orlando Yepez knew that the natural and probable consequences of the*

28

*provocative act were dangerous to human life and then acted with consciousness disregard for life*; four, in response to Victor Hernandez's, Orlando Yepez's, Jose Hernandez's, or William White's provocative act, Juan Alvarez killed Orlando Yepez; and, five, Orlando Yepez's death was a natural and probable consequence of Orlando Yepez's, Victor Hernandez's, William White's, or Jose Hernandez's provocative act.

"A provocative act is an act that: One, goes beyond what is necessary to accomplish the robbery in concert or burglary; and, two, whose natural and probable consequences are dangerous to human life because there's a high probability that the act will provoke a deadly response." (Emphasis added.)

Later, the court instructed the jury:

"The People alleged the following provocative acts:

"Pointed a gun at Juan Alvarez without justification;

"Tried to shoot Juan Alvarez without justification;

"Stabbed, attempted to stab, or instructed others to stab Juan Alvarez with a screwdriver without justification.

"You may not find the defendant guilty unless you all agree that the People have proved that: One, Orlando Yepez, Victor Hernandez, William White, or Jose Hernandez committed at least one provocative act; and, two, at least one of those provocative acts was committed by Orlando Yepez, Victor Hernandez, or Jose Hernandez was a direct and substantial factor that caused the killing. [¶] However, you do not all need to agree on which provocative act was proved."

Defendant argues the court's instruction, particularly the portion italicized above, improperly permitted the jury to convict defendant of provocative act murder even if he did not personally harbor malice. It merely required that defendant or an accomplice harbor malice. We agree the instruction was erroneous.

"Under the provocative act doctrine, when the perpetrator of a crime maliciously commits an act that is likely to result in death, and the victim kills in reasonable response to that act, the perpetrator is guilty of murder. [Citations.]" (*Gonzalez, supra*, 54 Cal.4th at p. 655.) "A murder conviction under the provocative act doctrine thus requires proof that the defendant personally harbored the mental state of malice, and either the defendant or an accomplice intentionally committed a provocative act ...." (*Ibid.*) "Malice will be implied if the defendant commits a provocative act knowing that this conduct endangers human life and acts with conscious disregard of the danger. [Citations.]" (*Ibid.*) Malice is also implied when the defendant aids and abets in the underlying crime with conscious disregard for human life. (*People v. Mejia* (2012) 211 Cal.App.4th 586, 604 (*Mejia*).) Thus, the doctrine can apply when either the defendant or his accomplice commits the provocative act. (See *People v. Superior Court* (*Shamis*) (1997) 58 Cal.App.4th 833, 846.)

The Attorney General largely focuses on harmlessness. However, on the issue of error, the Attorney General does briefly cite to *People v. Johnson* (2013) 221 Cal.App.4th 623, which stated that CALCRIM No. 561 adequately explains the requirement of implied malice. (*Johnson*, at p. 633.) However, *Johnson* offered no

29

analysis on the point. Regardless, it is undisputed that a defendant "*must personally* possess the requisite mental state of malice aforethought ...." (*Mejia, supra*, 211 Cal.App.4th at p. 603, italics added.) And it is clear that the jury instructions here permitted the jury to convict defendant even if he did not personally act with malice (so long as an accomplice acted with malice). The instructions were therefore erroneous on this point.

### A. Harmlessness

Failure to properly instruct the jury of the mens rea requirements that apply to the defendant in a provocative act murder prosecution can be harmless in some circumstances. (See *Gonzalez, supra*, 54 Cal.4th at pp. 662–667.) "'[A]n instructional error that improperly ... omits an element of an offense ... generally is not a structural defect in the trial mechanism that defies harmless error review and automatically requires reversal under the federal Constitution.' [Citation.] Instead, an erroneous instruction that omits an element of an offense is subject to harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18 .... [Citations.] In general, the *Chapman* test probes 'whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." [Citations.]' [Citation.] The high court in *Neder* [*v. United States* (1999) 527 U.S. 1] analogized instructional errors that arguably prevent the jury from finding an element of an offense to the erroneous admission or exclusion of evidence. [Citation.] In such cases, 'the harmless-error inquiry must be essentially the same: Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?' [Citation.]" (*Gonzalez, supra*, 54 Cal.4th at pp. 662–663.)

In analyzing this issue, courts look to the strength of the prosecution's evidence compared to the defense evidence. (E.g., *Gonzalez, supra*, 54 Cal.4th at p. 665.) If the jury resolved contested factual issues through other verdicts untainted by the alleged instructional error, we take those findings as a given in the prejudice analysis. (See *id*. at p. 664.)

Malice can be implied if the defendant aids and abets in the underlying crime with conscious disregard for human life. (*Mejia, supra*, 211 Cal.App.4th at p. 604.) We conclude that, given the jury's other findings and the evidence at trial, no rational juror could find defendant lacked this type of implied malice. Even when we momentarily disregard the challenged murder conviction, the remaining verdicts show the jury rejected defendant's version of events and concluded that he aided and abetted the home invasion robbery and personally used a firearm during the robbery. These findings necessarily establish that defendant knew of his accomplices' criminal purpose to commit robbery and intended to facilitate, promote, encourage or instigate the robbery. There was evidence defendant brought a loaded gun to the robbery, rushed at the victim with the gun, and told an accomplice to stab the victim. The verdicts and trial evidence overwhelming support the conclusion that defendant aided and abetted the robbery with conscious disregard for life.

Defendant does not dispute that the evidence supports the conclusion that he "personally acted with conscious disregard for life." However, he argues that there was evidence from which a jury could conclude an accomplice acted with conscious disregard for life. This contention is not dispositive with respect to harmlessness, so long as it is clear that no reasonable juror would have found that *defendant* did not *also* act with conscious disregard for life. That is, if no reasonable juror could have found defendant did not act with conscious disregard

1    for life, it is immaterial that other accomplices also acted with that mental state.

2    The prosecution only needs to establish that a defendant harbored malice when he
     or she committed the provocative act in question *or at the time he or she aided and*
3    *abetted the underlying felony*. (See *Mejia, supra,* 211 Cal.App.4th at p. 604.) Here,
     the jury necessarily concluded that defendant knew of his accomplices' intent to
4    commit robbery and intended to facilitate, promote, encourage or instigate the
     robbery. He then carried a firearm into the residence where the home invasion
5    robbery was to occur. This was more than sufficient to show defendant was acting
     with a conscious disregard to human life before a gun was fired. This conduct
6    clearly presents a real danger that any victims in the home could respond with
     lethal force. It was clearly established that defendant harbored a conscious
7    disregard for human life when he aided and abetted the home invasion robbery.

8    Hernandez, 2020 WL 6741665, at *15-17 (footnote omitted).

9                            a.   Legal Standard and Analysis

10          As set forth above, the state court determined that the instructions on provocative act

11   murder were erroneous since the jury instructions permitted the jury to convict Petitioner even if

12   *he* did not *personally* act with malice.   Nevertheless, the state court determined the error was

13   harmless.   The parties agree that the Chapman test was the correct standard to apply to the

14   erroneous instruction. See Chapman v. California, 386 U.S. 18 (1967).

15          Petitioner contends the state court misapplied the standard by applying a "no reasonable

16   juror" standard. Review of the state court's analysis, however, shows the state court concluded

17   beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the

18   error. The state court did not misapply the standard. As to the state court decision itself, the

19   parties agree on the standard that must be employed: Could a fairminded jurist agree with the

20   state court's application of Chapman, or was the state court's decision based on an unreasonable

21   determination of the facts?

22          Given the jury's verdicts on the other charged offenses and the state of the evidence, the

23   Court finds that a rational jurist could agree with the state court. The jury verdicts showed the

24   jury rejected Petitioner's version of the events and concluded that he aided and abetted the home

25   invasion robbery and personally used a firearm during the robbery.   The verdicts necessarily

26   showed that the jury concluded Petitioner knew of the accomplices' intent to rob and "intended to

27   facilitate, promote, encourage or instigate the robbery." Hernandez, 2020 WL 6741665, *17.  The

28

                                                    31

1   evidence also showed that Petitioner armed himself with a loaded gun, entered a residence while

2   armed, and then once inside the house, engaged the victim while armed with the gun. The

3   evidence further established that as Petitioner struggled with the victim over the gun, he yelled for

4   his accomplices to stab the victim. Considering the verdicts and the evidence, the state court's

5   determination that a jury would have found Petitioner acted in conscious disregard for human life

6   beyond a reasonable doubt was not objectively unreasonable. In other words, a fairminded jurist

7   could agree with the state court that the jury would have found Petitioner harbored malice beyond

8   a reasonable doubt regardless of the erroneous instruction. The claim should be rejected.

9                     5.      Claim Five

10          Petitioner alleges the trial court could not rely on his juvenile petition to find that he was

11   16 years old at the time he committed a prior strike offense.  Respondent contends the claim is

12   procedurally barred because the state court determined Petitioner had forfeited the claim by

13   failing to object to the admission of the petition at trial. In his traverse, Petitioner concedes the

14   claim, acknowledging it is procedurally barred. (Doc. 11-1 at 8.)

15                     6.      Claim Six

16          Petitioner contends the strike prior based on his juvenile conviction violated his

17   constitutional rights because he was not afforded the same rights as a defendant in a criminal trial.

18   Petitioner also raised this claim on direct review. The appellate court denied the claim as follows:

> Defendant objects to the court's use of his juvenile adjudication as a "strike"
> because he did not have the right to a jury trial during the juvenile proceedings. He
> acknowledges that "[i]n *People v. Nguyen* (2009) 46 Cal.4th 1007, 1019, the
> California Supreme Court [expressly] held that a juvenile adjudication of a serious
> felony can be charged and found true as a strike 'where the juvenile proceeding
> included all the constitutional protections applicable to such matters, even though
> these protections do not include the right to a jury trial.'" While he believes the
> basis for *Nguyen* has been "eroded" by subsequent authorities, he acknowledges
> that this court is still bound by the decision. Defendant has raised the issue in this
> appeal "to preserve it in the event of a change in the law."
>
> We agree that we are bound by *Nguyen* and reject defendant's claim.

Hernandez, 2020 WL 6741665, at *19.

          Respondent correctly notes that the Ninth Circuit has repeatedly recognized that there is

no clearly established Supreme Court precedent prohibiting the use of a prior juvenile

1    adjudication as a sentencing enhancement. <u>Boyd v. Newland</u>, 467 F.3d 1139, 1151-52 (9th Cir.

2    2006). In the absence of explicit direction from the Supreme Court, this Court cannot find that the

3    California court's use of Petitioner's juvenile adjudication as a sentencing enhancement was

4    contrary to, or involved an unreasonable application of, Supreme Court precedent. The claim

5    should be denied.

6                              7.      Claim Seven

7          In his final ground, Petitioner contends the cumulative effect of the errors previously

8    argued warrant habeas relief.  The appellate court rejected the cumulative error claim when it

9    rejected Petitioner's claim that jury instructions on provocative act murder were erroneous, as

10   follows:

11          Because this is the only instructional error and we have found it harmless,
            defendant's cumulative prejudice argument also fails.
12
            We previously acknowledged that the prosecutor made inaccurate statements of
13          law during closing. However, those misstatements concerned felony murder while
            the present instructional error concerned provocative act murder. Because the two
14          errors related to distinct theories of liability, "[w]e see no possibility their
            individual effects, if any, cumulatively resulted in prejudice to defendant." (<i>People</i>
15          <i>v. Moore</i> (2011) 51 Cal.4th 386, 417–418.)

16   <u>Hernandez</u>, 2020 WL 6741665, at *17 fn. 17.

17         Under the cumulative error doctrine, the combined effect of multiple errors at trial can

18   give rise to a due process violation, if the errors rendered the trial fundamentally unfair, even if

19   each error considered individually would not warrant relief. See <u>Parle v. Runnels</u>, 505 F.3d 922,

20   928 (9th Cir. 2007). "[T]he fundamental question in determining whether the combined effect of

21   trial errors violated a defendant's due process rights is whether the errors rendered the criminal

22   defense far less persuasive" and thus "had a substantial and injurious effect or influence on the

23   jury's verdict." <u>Id</u>. (internal citation and quotation marks omitted). The Ninth Circuit has "granted

24   habeas relief under the cumulative effects doctrine when there is a 'unique symmetry' of

25   otherwise harmless errors, such that they amplify each other in relation to a key contested issue in

26   the case." <u>Ybarra v. McDaniel</u>, 656 F.3d 984, 1001 (9th Cir. 2011) (citing <u>Parle</u>, 505 F.3d at 927).

27         The Court has addressed each of the errors Petitioner raised in his petition for writ of

28   habeas corpus and found no violation of the Constitution. Although the appellate court found one

                                              33

1    instructional error, it reasonably concluded it was harmless. Therefore, "[b]ecause we conclude

2    that no error of constitutional magnitude occurred, no cumulative prejudice is possible." Hayes v.

3    Ayers, 632 F.3d 500, 524 (9th Cir. 2011).  The claim should be denied.

4    **IV.     RECOMMENDATION**

5           Based on the foregoing, the Court RECOMMENDS that the Petition for Writ of Habeas

6    Corpus be DENIED with prejudice on the merits.

7           This Findings and Recommendation is submitted to the United States District Court Judge

8    assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the

9    Local Rules of Practice for the United States District Court, Eastern District of California.  Within

10   twenty-one (21) days after being served with a copy of this Findings and Recommendation, a

11   party may file written objections with the Court and serve a copy on all parties. Id. The document

12   should be captioned, "Objections to Magistrate Judge's Findings and Recommendation" and shall

13   not exceed fifteen (15) pages, except by leave of court with good cause shown. The Court will not

14   consider exhibits attached to the Objections. To the extent a party wishes to refer to any

15   exhibit(s), the party should reference the exhibit in the record by its CM/ECF document and page

16   number, when possible, or otherwise reference the exhibit with specificity. Any pages filed in

17   excess of the fifteen (15) page limitation may be disregarded by the District Judge when

18   reviewing these Findings and Recommendations pursuant to 28 U.S.C. § 636 (b)(1)(C).  The

19   parties are advised that failure to file objections within the specified time may result in the waiver

20   of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014).  This

21   recommendation is not an order that is immediately appealable to the Ninth Circuit Court of

22   Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure,

23   should not be filed until entry of the District Court's judgment.

24

25   IT IS SO ORDERED.

26   Dated:   **October 30, 2024**                    /s/ Sheila K. Oberto

27                                                    UNITED STATES MAGISTRATE JUDGE

28

34